IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 09-496 |
| JOSEPH LIGAMBI, et al. | : | |

THE UNITED STATES' TRIAL MEMORANDUM

The United States of America respectfully submits its trial memorandum in connection with the trial scheduled to commence in this criminal matter on October 31, 2013.

I. SUMMARY OF THE CHARGES

Count One of the third superseding indictment charges defendants JOSEPH LIGAMBI and GEORGE BORGESI with racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), in connection with their association with and participation in the affairs of a racketeering enterprise known as the Philadelphia La Cosa Nostra ("LCN") Family. The third superseding indictment also charges LIGAMBI with the following offenses:

Count 43: Conspiracy to conduct an illegal gambling business - JMA Video; 18 U.S.C. § 371;

Count 44: Illegal gambling business - JMA Video; 18 U.S.C. § 1955; and

Count 50: Obstruction of justice – witness tampering; 18 U.S.C. § 1512(b)(2).

II. OVERVIEW OF THE GOVERNMENT'S CASE

The government's trial evidence will include: (1) recordings of conversations of the defendants' and their co-conspirators intercepted pursuant to Court-authorized electronic monitoring and consensual recordings; (2) the testimony of cooperating witnesses, including former members and associates of the Philadelphia LCN Family, victims, and other witnesses;

1

(3) physical evidence, documents, photographs, and other evidence seized pursuant to search warrants; (4) bank records, business records, tax records, photographs, videotape, and documentary evidence obtained during the course of the investigation; (5) surveillance photographs and videotapes; and (6) the testimony of expert witnesses. The government's evidence will prove these offenses by proof beyond reasonable doubt.

A. <u>The Enterprise - The Philadelphia LCN Family</u>

The LCN is a national and international criminal organization known to its members as "This Thing of Ours" and to the general public as the "Mafia" or the "Mob." The LCN has operated in substantially continuous fashion through a system of "families" based in various cities and regions of the United States, including but not limited to Philadelphia, New York, Chicago, New England, and Florida.

LCN crime families are structured organizations, with a well-defined chain of command. LCN crime families typically have a hierarchy that includes a "boss," an "underboss," one or more "caporegimes," and a "consigliere." The "caporegimes," also referred to as "capos," "captains," or "skippers," are formally initiated members who supervise and control the activities of groups known as "regimes" or "crews" of "soldiers" and "associates." "Soldiers" are members who have undergone a formal initiation ceremony by which they are "made" or "straightened out." "Soldiers" recruit and control the activities of "associates," and are "with" the caporegime who supervises their crew. "Associates" are not "made" members, but are trusted by LCN members to assist them in criminal activities. Most criminal activity of LCN families is committed by "soldiers" and "associates" at the crew level.

Historically, the Philadelphia LCN Family has operated under this structure and has been in substantially continuous operation for decades. Over the past 40 years, its "bosses"

and "acting bosses" have included Angelo Bruno, Philip Testa, Nicodemo Scarfo, Anthony Piccolo, John Stanfa, Ralph Natale, Joseph Merlino and LIGAMBI.  The Philadelphia LCN Family has been based in Philadelphia and operated in Eastern Pennsylvania and southern New Jersey.  The Philadelphia LCN Family also had a crew operating in northern and central New Jersey for at least 40 years.  The North Jersey crew has been led by "caporegimes," including Ralph Napoli, Pasquale Martirano, Joseph Sodano, Peter Caprio and Joseph Licata.

      The common purposes of the Philadelphia LCN Family are: (a) to generate money for its members and associates through the various criminal acts including, but not limited to: extortion, loansharking, gambling, and the collection of unlawful debts; (b) to protect the its territory and to promote its interests through violence, actual and implied threats of violence, and the cultivation and exploitation of the Philadelphia's LCN Family's reputation for violence; (c) to control, manage, finance, supervise, participate in, and set policy concerning the manner in which the enterprise makes money through illegal means; and (d) to conceal the existence and operations of the enterprise from law enforcement through acts designed to obstruct justice.

      To increase the strength and revenues of the racketeering enterprise and to perpetuate its existence, the members of the Philadelphia LCN Family periodically proposed new members.  A proposed member had to be loyal to the leadership structure, be willing to follow its orders without question, and be "a stand-up guy," meaning he would refuse to cooperate with law enforcement if arrested.  Proposed members also had demonstrate a willingness and ability to commit crimes, including violent crimes, and to earn money for the Philadelphia LCN Family.  To formalize the "making" of new members, the enterprise conducted ritual initiation ceremonies.  During these ceremonies, proposed members were inducted into the Philadelphia LCN Family and informed of its rules.

It was expected and accepted that "made" members would periodically be incarcerated. Serving prison sentences without cooperating with law enforcement authorities was honored and encouraged. However, imprisonment did not suspend the "made" members' criminal careers; incarcerated members often continued to conduct and participate in the affairs of the enterprise from prison. Other members of the enterprise were expected to provide financial support to an imprisoned member and his family.

The enterprise required its members and associates to disclose their criminal activities and to share their criminal proceeds with the leaders. For example, a "soldier" who wished to engage in illegal bookmaking or loansharking would advise his "caporegime" who either approved or prohibited the activity in question. Members and associates would "kick up" a portion of their criminal proceeds to the hierarchy.

To minimize friction with other LCN families and to protect itself with allies in the event of underworld disputes, the Philadelphia LCN Family sought to establish and maintain relationships with LCN families operating in other geographic regions. These relationships facilitated criminal activities, provided mechanisms to minimize conflict and mediate disputes, and enhanced the power of the enterprise. It was necessary for the Philadelphia LCN Family to stay abreast of the leadership of other families. In meetings with members of other LCN families, members of the Philadelphia LCN Family engaged in discussions about LCN leadership, the status of their respective "made" members, other "made" members of who were incarcerated, and important events in the histories of their respective families. These discussions served to foster and build mutual trust, respect and camaraderie among members of different LCN families, while at the same time promoting fidelity and commitment to the shared criminal goals of the LCN. For example, after the New York Lucchese LCN Family "made" the son of

the former boss of the Philadelphia LCN Family and expressed interest in recruiting other individuals associated with the Philadelphia LCN Family, LIGAMBI and Staino met with members of the New York Gambino LCN Family to express their concern over the encroachment by the Lucchese LCN Family, and to seek the support of the New York Gambino LCN Family in preventing further encroachment by the Lucchese LCN Family upon money-making activities of the Philadelphia LCN Family.

B. <u>The Racketeering Conspiracy</u>

   Through their words and actions, the defendants agreed to participate in the conduct of the affairs of the enterprise, through a pattern of racketeering activity and the collection of unlawful debt.  Each defendant agreed that at least two acts of racketeering activity or the collection of unlawful debt would be committed in furtherance of the affairs of the Philadelphia LCN Family enterprise.

   The collection of unlawful debt involved collections of debts from various individuals that were incurred in gambling activity and in connection with the business of gambling, or were unenforceable because of the usury laws and which were incurred in connection with the business of lending money at a rate usurious.

C. <u>The Roles of the Defendants and Other Co-conspirators in the Enterprise</u>

   LIGAMBI, a/k/a "Uncle Joe," a/k/a "Unc," was a made member who rose through its ranks to become "underboss."  After the incarceration of Joseph Merlino, a prior boss of the Philadelphia LCN Family, LIGAMBI became the "acting boss."

   BORGESI, the nephew of defendant LIGAMBI, was a made member who served in various roles including "consigliere."  Although he was incarcerated during much of the racketeering conspiracy, BORGESI continued to participate in the affairs of the enterprise from

prison through others such as LIGAMBI, Louis Monacello, Frank DiGiacamo and Anthony Aponick.

Other co-conspirators include the following.

Joseph Massimino, a/k/a "Mousie," was a made member who served at times as the "underboss" of the Enterprise. Massimino participated in the operation of illegal gambling businesses, extortion, and loansharking. In March 2004, Massimino was convicted of state criminal charges and incarcerated, but continued to participate in the Enterprise's affairs while incarcerated.

Anthony Staino, Jr., a/k/a "Ant," was a made member who rose to the rank of "caporegime" and assisted LIGAMBI in controlling the enterprise's affairs, including its gambling, extortion, and loansharking operations.

Martin Angelina, a/k/a "Marty," was a high-ranking made member, who participated in an illegal gambling business and in attempting to collect extensions of credit using extortionate means.

Damion Canalichio, a/k/a "Dame," and Gaeton Lucibello, "a/k/a The Big Guy," a/k/a "Gate," were made members of the Philadelphia LCN Family. Canalichio participated in illegal sports bookmaking and loansharking activities. Lucibello assisted Massimino in operating the enterprise's affairs from prison. Lucibello participated in illegal video gambling businesses and extortion.

Joseph Licata, a/k/a "Scoops," was a made member and a "capo" of the North Jersey crew of the Philadelphia LCN Family. Licata supervised Louis Fazzini, a/k/a "Big Lou," a made member of Licata's crew, in the operation of an illegal sports gambling business, and other activities.

6

Louis Monacello and Frank DiGiacomo were associates and members of BORGESI's crew, who participated in sports bookmaking, loansharking, the collection of debts, and other matters for the Philadelphia LCN Family.

Gary Battaglini and Louis Barretta, a/k/a "Sheep," were associates of the Philadelphia LCN Family. Barretta and Battaglini operated an illegal sports bookmaking operation, engaged in loansharking, and collected debts on behalf of the enterprise.

D. The Pattern of Racketeering Activity

To generate income for the Enterprise, the members and associates of the Philadelphia LCN Family engaged in a variety of money-making criminal activities, including: the extortion of property and money from persons involved in legitimate and illegitimate businesses; illegal gambling businesses involving sports bookmaking and electronic gambling devices; and loansharking, including making of usurious loans and extortionate extensions of credit, financing extortionate extensions of credit, and collecting extensions of credit by exploiting the Philadelphia LCN Family's reputation for violence.

(i) Illegal Gambling Businesses

LIGAMBI, along with BORGESI, Staino, Massimino, Angelina, Lucibello, Canalichio, Barretta, Battaglini, and others, operated illegal gambling businesses for the benefit of the Philadelphia LCN Family.

(a) The JMA Video Poker Business - LIGAMBI, Massimino, and Staino, and others, placed electronic gambling devices, including video poker machines and slot machines, in bars, restaurants, convenience stores, coffee shops and other locations in Philadelphia and its suburbs, to be used for illegal gambling in violation of the laws of the Commonwealth of Pennsylvania. Curt Arbitman serviced the video machine on behalf of the Philadelphia LCN

7

Family. In or about July 2002, defendants LIGAMBI, Massimino, and Staino created JMA Industries to attempt to conceal the illegal nature of their operations and the criminal proceeds of the illegal gambling business from law enforcement. The acronym "JMA" was comprised of the first initials of the defendants' first names or nicknames: "<u>J</u>oe" (LIGAMBI), "<u>M</u>ousie" (Massimino) and "<u>A</u>nthony" (Anthony Staino). JMA Industries purported to be a legitimate company, but in fact, the co-conspirators used JMA Industries to conceal their illegal electronic gambling business

      (b) First Ward Republican Club - Angelina and Canalichio, operated an illegal gambling business involving video poker machines at the First Ward Republican Club, a private club located at 2300 S. Woodstock Street, Philadelphia.

      (c) Sports Bookmaking - LIGAMBI, Staino, Canalichio, Barretta, Battaglini, and others participated in the operation of illegal sports bookmaking businesses on behalf of the Philadelphia LCN Family.

  (ii) <u>Loansharking</u>

      LIGAMBI, BORGESI, Staino, Massimino, Canalichio, Barretta, Battaglini, and others, made extortionate extensions of credit, and collected extensions of credit through extortionate means, to generate income for the Philadelphia LCN Family. The defendants cultivated and exploited the violent reputation of the Philadelphia LC N Family to threaten debtors with express and implied threats of physical violence and economic harm, and to instill fear in their victims. For example, in April 2002, Canalichio and Barretta told Michael Orlando, while collecting an usurious debt, that they were collecting "Uncle Joe's money" (referring to LIGAMBI). Barretta later told Orlando that Canalichio was "capable of cracking" him if necessary to collect the debt. In January 2002, Battaglini threatened Peter Albo by stating that if

Albo did not make a payment, then Albo would "see a side of me you ain't gonna fucking enjoy .... Cause right now I wanna fuckin' put a bullet in your head." In March 2002, Barretta told Albo that Barretta had to answer to the leadership of the enterprise, stating: "[t]hey want their money Fridays, you know what I'm trying to say."

In August 2004, Staino and his associate Robert Ranieri, threatened "Dino" in connection with an extortionate extension of credit. Unbeknownst to the defendants, "Dino" was an FBI agent acting in an undercover capacity. Staino communicated to "Dino" the importance of making prompt payments, by threatening: "Please on my life. I like you. I don't want to fucking have to hurt you."

From spring 2005 until 2008, BORGESI and Monacello provided money to DiGiacomo for him to make extortionate extensions of credit to others. DiGiacomo provided illegal proceeds collected from these extortionate extensions of credit to Monacello. LIGAMBI, BORGESI, Staino, and Angelina, also extended usurious loans and extortionate extensions of credit to, and engaged in debt collections using extortionate means from Associate #1, using the Enterprise's reputation for violence.

Anthony Aponick was incarcerated with BORGESI at the Beckley Federal Correctional Institution in West Virginia. BORGESI discussed his role in the criminal affairs of the Philadelphia LCN Family with Aponick. BORGESI also recruited Aponick to become a member of BORGESI's LCN crew in Philadelphia after Aponick was to be released from prison.

(iii) <u>Extortion</u>

LIGAMBI, BORGESI, Staino, Massimino, and other co-conspirators, extorted others to generate income for the enterprise and its members, through express and implied threats and intimidation. For example, from 2000 to 2007, LIGAMBI identified bookmakers in

9

Philadelphia and New Jersey, and directed Monacello to collect "street tax," "tribute payments," and "Christmas payments" from the bookmakers to avoid personal harm and the disruption of their bookmaking businesses.  From approximately 2002 to 2006, Massimino, with the assistance of Lucibello, extorted bookmaker Jack Buscemi by demanding yearly tribute payments to the Philadelphia LCN Family, to avoid personal harm and the disruption of Bookmaker A's illegal bookmaking business.

In or about May 2001, LIGAMBI, Massimino and Staino extorted the owners of another electronic gambling device business that specialized in video poker machines, by forcing them to sell their illegal business including 34 video poker machines which were located at over 20 "stops," to the Philadelphia LCN Family.  To conceal the extortion, the defendants attempted to force the owners to sign a fictitious agreement of sale, and paid the owners a portion of the actual value of the business, to create the false appearance that the extortion was a legitimate business transaction.

(iv) Concealment and Witness Intimidation

The defendants attempted to conceal their criminal activities from law enforcement.  For example, the defendants and their co-conspirators regularly communicated in coded language over the telephone, participated in "walk and talks," that is, covert conversations while walking to and standing at locations where the defendants believed they could not be intercepted.  LIGAMBI corruptly persuaded a grand jury witness to withhold evidence from the grand jury.

III. ELEMENTS OF THE OFFENSES

The essential elements of the offenses which the government will prove at trial are set forth in the Court's Final Jury Instructions.

IV. STIPULATIONS

The parties agreed to certain stipulations of fact during the first trial in this matter, and have agreed to the same stipulations for the purpose of the retrial.

V. ESTIMATE OF TRIAL TIME

The government anticipates that it can present its case-in-chief in six weeks. However, the length of the government's case will depend on the length of cross-examination.

The government has provided the Court and the defendant's with its witness list. Philadelphia Police Officer Christopher Isern will be called to testify instead of Officer Cynthia Fellicitti.

VI. POTENTIAL TRIAL ISSUES

A. The Government's Expert Witnesses

At trial, the government will call several expert witnesses who will testify about matters relating to LCN organized crime families and the Philadelphia LCN family. The Court has previously ruled on the admissibility of the government's expert testimony. See United States v. Ligambi, 902 F. Supp. 2d 718 (E.D. Pa. 2012).

FBI agents who participated in the Court-authorized electronic monitoring of the defendant's communications, including John Augustine and John Martinelli, will testify regarding the meaning of code words and cryptic conversations captured on the recordings. The FBI case agents will also identify nicknames and references to members and associates, and activities of the Philadelphia LCN Family discussed during the recorded conversations. Philadelphia Police Detective Marcellino Pinero will testify regarding the identification of non-defendant members and associates of the Philadelphia LCN Family.

11

Joaquin Garcia, a retired FBI agent who worked for several years in an undercover capacity posing as an associate of the New York Gambino LCN Family, and another FBI agent who has worked for many years in the investigation of LCN crime families, will testify as an expert regarding the history, structure, rules of conduct, methods of operation, initiation ceremonies, inter-family relationships, membership, and related topics, of LCN crime families.

FBI Forensic Examiner James Douglas Dunlap will testify as an expert regarding gambling businesses, including video gambling devices and sports bookmaking.  Mr. Douglas will conduct in-court demonstrations of a Dodge City video poker machine and  a CherryMaster slot machine,  The Dodge City video poker machine was seized during the execution of search warrants in this matter.  The CherryMaster slot machine was seized by the PSP in a separate investigation, but is substantially similar to the CherryMaster slot machines seized in this matter and examined by Mr. Dunlap.  The CherryMaster slot machine has been modified to demonstrate different types of "knock off" devices found on CherryMaster machines.

B.  Recalling the Government's Case Agents To Testify Multiple Times

As was done during the first trial, the government will call FBI case agents John Augustine and John Martinelli multiple times to testify regarding different aspects of the investigation, and  to introduce recorded conversations from the multiple wiretaps and seized evidence from different searches.   Mr. Dunlap will be called twice, once to testify regarding video gambling devices and once to testify regarding sports bookmaking.

The Courts have utilized this procedure without objection in complex wiretap cases.  See United States v. Shamsud-din Ali, Crim. No. 04-00611 (FBI case agent called to testify multiple times to introduce and explain intercepted conversations in racketeering case).

12

C.  Evidence that Defendants Were Incarcerated During the Conspiracy

As charged in the third superseding indictment, BORGESI and Massimino continued to participate in the criminal affairs of the Philadelphia LCN Family while serving prison sentences for other offenses not charged in this case.  The government's evidence will include prison mail, recordings of prison telephone conversations, and prison records relating to visitors, telephone logs, and inmate financial accounts.  Other co-conspirators, such as Canalichio and Licata were incarcerated at various times during the conspiracy.  The third superseding indictment avers that members of the Philadelphia LCN Family were required to provide financial support for members who were incarcerated, and their families.  In addition, some of the government's recorded conversations make reference to, and cooperating witnesses will testify about defendants and other members of the Philadelphia LCN Family being in prison at various times during the racketeering conspiracy.

Evidence that a defendant was in prison is admissible when relevant to a material issue, provided the evidence is not unfairly prejudicial.  See United States v. Jones, 447 Fed. Appx. 319 (3d Cir. 2011); United States v. Bledsoe, 449 Fed. Appx. 159 (3d Cir. 2011).

E.  Opening Statements

During the government's opening statement, counsel will utilize photographs of the individual defendants and other co-conspirators.  Identity is not an issue in this case, and each defendant and co-conspirator will be identified by witnesses.  However, due to the number of defendants and the number of witnesses and other individuals who will be referenced during the course of the trial, the government's reference to these photographs during the opening will minimized the risk of juror confusion.

Counsel for the parties should be mindful of the appropriate standards for opening statements. Standard 4-7.4 of the American Bar Associations's Standards for Criminal Justice and Defense Function, which provide:

> Defense counsel' opening statement should be confined to a statement of the issues in the case and the evidence defense counsel believes in good faith will be available and admissible.

Standard 4-7.4, ABA Standards for Criminal Justice and Defense Function (3d 1993) ("ABA Standards").

The ABA commentary reflects that "the purpose of the opening statement is to narrowly limit defense counsel to a brief outline of the issues and the matters counsel believes can be supported with competent evidence." ABA Standards for Criminal Justice, § 4-7.4, commentary (2d Ed. 1986). In other respects, the opening statement is governed by the same principles that apply to closing arguments. Id.

> Standard 4-7.7 of the ABA Standards provides:
>
> (a) In closing argument to the jury, defense counsel may argue all reasonable inferences from the evidence in the record. Defense counsel should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.
>
> (b) Defense counsel should not express a personal belief or opinion in his or her client's innocence or personal belief or opinion in the truth or falsity of any testimony or evidence.
>
> (c) Defense counsel should not make arguments calculated to appeal to the prejudices of the jury.
>
> (d) Defense counsel should refrain from argument which would divert the jury from its duty to decide the case on the evidence.

ABA Standards, § 4-7.7.

The allegation that the government had an improper motive in investigating or prosecuting a defendant is essentially a claim of selective prosecution.  See United States v. Stewart, 2004 WL 113506, Jan. 26, 2004 (S.D.N.Y).  A selective prosecution claim is a matter addressed to the Court, and not the jury, and therefore the defendant may not argue to the jury that the government had an improper motive in prosecuting the defendant.  Id. at 2.

    Respectfully submitted,

    ZANE DAVID MEMEGER
    United States Attorney

    /s/ Frank A. Labor III
    FRANK A. LABOR III
    SUZANNE E. ERCOLE
    Assistant United States Attorney

    JOHN S. HAN
    Trial Attorney
    Organized Crime and Gang Section
    U.S. Department of Justice

CERTIFICATE OF SERVICE

FRANK A. LABOR III, certifies that copies of the United States' Pretrial Memorandum were served on defense counsel for the defendants by ECF on October 30, 2013.

/s/ Frank A. Labor III
FRANK A. LABOR III
Assistant United States Attorney
