**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 09-00496** |
| **v.** | : | **DATE FILED:** |
| **JOSEPH LIGAMBI,**<br>**a/k/a "Uncle Joe,"**<br>**a/k/a "Unc,"**<br>**GEORGE BORGESI,**<br>**a/k/a "Georgie,"** | : | **VIOLATIONS:**<br>**18 U.S.C. § 1962(d) (RICO conspiracy - 1 count);**<br>**18 U.S.C. § 1512 (tampering with a witness - 1 count);**<br>**18 U.S.C. § 1955 (illegal gambling business - 1 count);**<br>**18 U.S.C. § 371 (conspiracy - 1 count)**<br>**18 U.S.C. § 2 (aiding and abetting - 1 count);**<br>**Notice of Forfeiture** |

Order (1) Filed of record

(1) [Renumbered] Third Superseding Indictment.

**THIRD SUPERSEDING INDICTMENT**

**COUNT ONE**

**THE GRAND JURY CHARGES:**

THE ENTERPRISE

1. At all times relevant to this superseding indictment, defendants

**JOSEPH LIGAMBI,**
**a/k/a "Uncle Joe,"**
**a/k/a "Unc," and**
**GEORGE BORGESI,**
**a/k/a "Georgie,"**

and Joseph Massimino, a/k/a "Mousie," Martin Angelina, a/k/a "Marty,"Anthony Staino, Jr., a/k/a "Ant," Gaeton Lucibello, a/k/a "The Big Guy," a/k/a "Gate," Damion Canalichio, a/k/a "Dame," Louis Barretta, a/k/a "Sheep," Gary Battaglini, Joseph Licata, a/k/a "Scoops," Louis Fazzini, a/k/a "Big Lou," Louis Monacello, Peter Caprio, and others known and unknown to the grand jury, were members of [or] were associated with the Philadelphia organized crime family of La Cosa Nostra ("the Philadelphia LCN Family" or "the Enterprise"). The Philadelphia LCN Family, including its leadership, members, and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), namely, a group of individuals associated in fact, although not a legal entity, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce. The Philadelphia LCN Family constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the Enterprise.

**Structure of the Philadelphia LCN Family**

2.      La Cosa Nostra ("LCN") is a national and international criminal organization known to its members as "This Thing of Ours" and to the general public as the "Mafia" or the "Mob." The LCN has operated in substantially continuous fashion through a system of "families" based in various cities and regions of the United States, including but not limited to Philadelphia, New York, Chicago, New England, northern New Jersey and Florida, during much of the Twentieth Century and into the Twenty-First Century.

3.      The geographical territories in which these families operate tend to overlap. For example, five LCN families, the Gambino LCN Family, the Genovese LCN Family, the Lucchese LCN Family, the Bonanno LCN Family and the Colombo LCN Family, are based in New York City, but operate throughout the Northeast and elsewhere. Because of this geographical overlap, diplomatic relationships and regular liaisons among LCN families are essential to avoid violent conflict.

4.      Typically, LCN families are structured criminal organizations, each with a well-defined chain of command. LCN families typically feature a hierarchy that includes a "boss," an "underboss," one or more "caporegimes," and a "consigliere." Historically, the Philadelphia LCN Family has been organized and operated in this classic modality.

A.      The "boss" is a formally initiated member who is the absolute ruler of the family. He wields life and death power and controls all of the LCN family's operations. He is

empowered to give orders to his subordinates in all matters and to overrule orders and decisions made by his subordinates. He has the authority to promote members of his LCN family into the hierarchy. Likewise, he has the authority to demote or "take down" a member of the hierarchy and to suspend a member from participation in the Enterprise's criminal ventures, a practice referred to as "putting him on the shelf." He designates the crew to which each individual "soldier" is assigned. The "boss" also has the authority to demand and receive as his own whatever share of the proceeds of the LCN family's criminal activities he chooses.

B. The "underboss" is a formally initiated member who is second in command. He typically acts as the street boss, supervises the "caporegimes," and insulates the boss from direct involvement in criminal activities committed on his behalf by members of the Enterprise.

C. The "consigliere" is a formally initiated member who acts as the advisor to the "boss" and the "underboss." Typically, he is an experienced and well-respected mobster who can be counted on in matters involving inter-family diplomacy and the resolution of internal family disputes.

D. The "caporegimes," also referred to as "capos," "captains," or "skippers," are formally initiated members who lead, supervise and control the activities of one or more groups known as "regimes" or "crews" of individual "soldiers" and "associates." The vast majority of day-to-day criminal activity committed in the conduct of the affairs of the LCN family is perpetrated by "soldiers" and "associates" at the crew level.

E. "Soldiers" are members of the family who have undergone a formal initiation ceremony by which they are "made" or "straightened out." "Soldiers" recruit and

control the activities of various "associates." Individual "soldiers" are said to be "with" the "caporegime" to whose crew they are assigned. Normally, members of the hierarchy were "soldiers" who, over the course of time, were promoted to positions of greater responsibility.

F. "Associates" are individuals who, though not "made," are trusted by the "made members" to assist them in conduct of the LCN's affairs through criminal activity. Each "associate" seeks the protection and economic benefits to be derived from such an association, typically aspires to membership in the LCN family, functions in a subordinate capacity to the "soldier" who controls him, and is said to be "with" that soldier and "with" that soldier's "crew." In order to attain formal membership, the associate first has to be "proposed" and, if deemed worthy, may be formally initiated.

G. During times when the hierarchy of a given LCN family is impaired because of incarceration of the leadership or intense law enforcement pressure, a single "acting boss," or an "administration" consisting of several experienced and high-ranking members, may be designated to perform the duties and responsibilities of the "boss." Likewise, an "acting underboss," "acting consigliere," and/or "acting caporegime(s)" may be designated.

5. The Philadelphia LCN Family has been in substantially continuous operation for much of the Twentieth Century into the Twenty-First Century. It is organized in the fashion outlined above in paragraphs 2, 3, and 4. Over the course of the past 40 years, its "bosses" and "acting bosses" have included Angelo Bruno, Philip Testa, Nicodemo Scarfo, Anthony Piccolo, John Stanfa, Ralph Natale, Joseph Merlino and JOSEPH LIGAMBI.[1] Historically, the Philadelphia LCN Family has been based in Philadelphia and has operated primarily in Eastern

[1] Bruno, Testa, and Piccolo are now deceased. Scarfo, Stanfa, Natale and Merlino have been prosecuted, convicted and imprisoned in separate criminal prosecutions.

Pennsylvania and southern New Jersey. However, the Philadelphia LCN Family also has had a "regime" operating in northern and central New Jersey and typically based in Newark for at least 40 years. Over the course of the past 40 years this crew has been headed by various "caporegimes," including Ralph Napoli, Pasquale Martirano, Joseph Sodano, Peter Caprio and Joseph Licata.[2]

**Purposes of the Enterprise**

6. The principal purposes of the Philadelphia LCN Family were: (a) to generate money for its members and associates through the commission of various criminal acts including, but not limited to: extortion, loansharking, illegal gambling, and the collection of unlawful debts; (b) to protect the Enterprise's territory and promote its interests through violence, actual and implied threats of violence, and the cultivation and exploitation of the Enterprise's reputation for violence; (c) to control, manage, finance, supervise, participate in, and set policy concerning the manner in which the Enterprise made money through illegal means; and (d) to conceal the existence and operations of the Enterprise from law enforcement detection through acts designed to obstruct justice.

**Manner and Means of the Enterprise**

7. The manner and means of the Enterprise, i.e. the Philadelphia LCN Family, included the following:

[2] Napoli, Martirano and Sodano are now deceased. Caprio was prosecuted, convicted and imprisoned in a separate criminal prosecution.

A. To supervise and control the activities of the Enterprise, the members and associates of the Enterprise created, maintained, and honored a leadership structure, as previously described. Disloyalty to the current "boss" or recognized hierarchy, failure to abide by the chain of command or rules of protocol, or disobedience to orders could result in serious disciplinary action including bodily harm and death.

B. To increase the strength and revenues of the Enterprise and to perpetuate its existence, the members of the Enterprise "proposed" new members. The sons and relatives of made members of the Enterprise were given favored consideration for membership. The criteria for being "proposed" included, among other things:

1. That the person proposed for membership be loyal to the hierarchy of the Enterprise, willing to follow its orders without question, and be "a stand-up guy," meaning a person who would refuse to cooperate with law enforcement authorities if arrested; and

2. That the person proposed for membership demonstrate the willingness and capability to commit crimes, including violent crimes, and to earn money through the commission of crimes as approved and directed by the hierarchy of the Enterprise. Usually, but not always, this demonstration required several years' service as a productive and reliable associate of the Enterprise.

C. To formalize the "making" of new members, the Enterprise conducted ritual initiation ceremonies. During these ceremonies, proposed members were inducted into the Philadelphia LCN Family and informed of the rules of the Enterprise. While slight variations occurred from "making ceremony" to "making ceremony," the scenario was essentially as follows.

1.      Typically, the "boss" or "acting boss" presided over the "making ceremony," which was conducted with great secrecy and security.  The "associate" who was about to be "made" was brought to a location not previously disclosed to him and taken into a room where the "boss" was present along with others, all of whom were "made members."   The person to be "made" would stand face to face with the "boss" across a table on which a gun and a knife would be placed, and he would be asked if he knew why he was there, to which the correct answer was that he did not.  He was then asked if he was friendly with all those present and would use the gun and the knife to help "our friends," meaning the other "made" members of the Enterprise, if called upon to do so.  When he said that he would, he was told that once he was "made," the family would come before everyone and everything else in his life.  Once he assented to that, the boss would prick his finger to cause it to bleed and put blood on a piece of paper, preferably a religious holy card with a picture of a saint.  The person to be "made" would be told to cup his hands as the "boss" would light the paper with a match and place it in his cupped hands.  The person to be "made" would be told to say words to the effect: "may I burn like this saint if I betray my friends."

2.      Thereafter, the "boss" would speak in Italian, "making" him, and he would kiss and embrace those members of the family who were present.  The "boss" would explain the rules of the LCN family, including the Code of Silence or "Omerta," which prohibited a member from revealing the activities and even the existence of the Enterprise to outsiders in general and to law enforcement in particular.  The penalty for violating "Omerta" was death.  The "boss" would also place him with a "caporegime."  Throughout the ceremony it was impressed upon the person being "made" that once he joined, he joined for life.

D. To perpetuate the Enterprise, to establish and maintain underworld primacy, and extend its power, the members and associates of the Enterprise used violence and threats of violence toward those who posed a threat to the Enterprise and who might jeopardize its operations. Members of the Enterprise deemed themselves the kings of the underworld and felt free to do what they pleased in dealing with underworld figures who were not "made" members, knowing that they would enjoy the full backing and support, including violent support, of the other "made" members of the Enterprise.

E. In light of the criminal purposes of the Enterprise, it was expected and accepted that "made" members would experience periodic terms of incarceration. Service of prison sentences without cooperating with law enforcement authorities was honored within the Enterprise and affirmatively encouraged. Incarceration did not necessarily suspend the "made" members' criminal careers. In fact, incarcerated "made" members often continued to conduct and participate in the affairs of the Enterprise from prison to maintain the continuous flow of income from their illegal businesses. When a "made" member was incarcerated, un-incarcerated members of the Enterprise were expected to provide financial support to the incarcerated "made" member and his family by maintaining the flow of income from his illegal activities, making donations to him and his family, or doing both. This was done to prevent incarcerated members from breaking ranks, cooperating with authorities, and testifying about the criminal affairs of the Enterprise.

F. To minimize friction with other LCN families while conducting criminal activities in and affecting interstate commerce, and to position itself to have allies in the event of underworld disputes, it was necessary for the Enterprise to establish formalized relationships with other LCN families. These relationships facilitated the conduct of criminal activities,

provided mechanisms to minimize conflict and to mediate disputes, and enhanced the underworld power of the Enterprise.

1.      "Made" members were expected to show a certain degree of respect toward other "made" members, including those in other LCN families, that they were not required to show in dealing with underworld figures who were not "made." Consequently, it was very important to know who was "made" and who was not.

2.      In the world of LCN families, this meant establishing and maintaining liaisons among the crime families, and, given the ethic of secrecy, required covert introduction rituals between members of different crime families before they could discuss or undertake joint criminal business ventures. The Enterprise utilized the standard LCN introduction protocol: "made" members in different families who had not yet been formally introduced to each other as such would be introduced to each other by a third "made" member who previously had been formally introduced to each. This formal introduction ritual was a necessary prerequisite to each recognizing the other as one possessing LCN membership status that merited trust and respect. Following such an introduction, a "made" member of the Enterprise could confer with the "made" member of the other LCN family to determine whether another individual was "made" or not, discuss Enterprise affairs, and plan and conduct joint criminal business activities with his counter-part in the other family in a fashion consistent with the accepted rules of the Enterprise.

3.      In order to have certainty in doing business with other LCN families, it was necessary for the Enterprise stay abreast of the leadership of other families, a task complicated by the leadership turbulence occasioned by law enforcement actions and internal violence within LCN families. The Enterprise met this challenge by establishing liaison

relationships with other LCN families.  In meetings with members of other LCN families, members of the Enterprise engaged in collegial discussions about changes in family leadership, the current status of certain of their respective "made" members, the places where "made" members spent periods of incarceration, the identities of other "made" members of whatever LCN family who were incarcerated with them, and important historical events in the histories of their respective families.  In sharing information these discussions served to foster and build mutual trust, respect and camaraderie among members of different LCN families, while at the same time promoting fidelity and commitment to the shared criminal goals of the LCN and facilitating formal relationships for the purpose of conducting criminal activities.

       4.      To enhance their power and to ensure continuity, LCN families would attempt to establish relationships with other LCN families which would serve as the basis for alliances in the event of disputes between different organized crime families.  For example, after the New York Lucchese LCN Family "made" the son of the former boss of the Philadelphia LCN Family and expressed interest in recruiting other individuals associated with the Philadelphia LCN Family, JOSEPH LIGAMBI and Anthony Staino, Jr. met with members of the New York Gambino LCN Family to express their concern over the encroachment by the Lucchese LCN Family, and to seek the support of the New York Gambino LCN Family in preventing further encroachment by the Lucchese LCN Family upon money-making activities of the Philadelphia LCN Family.

       G.      To perpetuate the Enterprise, the members and associates of the Enterprise attempted to conceal from law enforcement authorities the existence of the Enterprise, the identity of its members and associates, the ways in which it conducted its affairs, and the decisions and orders given by the leaders to others working for the Enterprise.

H. To generate income for the Enterprise, the members and associates of the Enterprise engaged in money-making criminal activities, including:

1. the extortion of property and other things of value from persons who were involved in legitimate and illegitimate businesses, including illegal gambling businesses;

2. the operation of illegal gambling businesses involving sports bookmaking and electronic gambling devices, including video poker and other gambling machines and the collection of unlawful debt resulting from such illegal gambling ventures; and

3. loansharking, which includes the making of unlawful usurious loans and extortionate extensions of credit, and the financing and collection of such loans and extensions of credit, using the Enterprise's reputation for violence to force victims to repay loans and to pay interest at usurious rates.

I. To compensate the hierarchy and to assert Enterprise control over "made" members and associates, the Enterprise established a system requiring disclosure of criminal activity and sharing of its proceeds. Each level of the Enterprise was responsible for advising the next higher level of all proposed criminal activity. Those higher levels in turn decided whether to sanction the criminal activity of those below them. Thus, for example, a "soldier" who wished to engage in illegal bookmaking activity or loansharking activity would advise his "caporegime" who either approved or prohibited the activity in question.

1. Each person associated with the Enterprise was obligated to keep his supervisor informed about the nature of criminal activity in which he and his subordinates engaged.

2. "Made" members and associates of the Enterprise distributed a portion of their criminal income to the leadership of the Enterprise.

3. Members suspected of concealing criminal profits could be called in to "report" to superiors within the Enterprise and explain their activities and profits. Lying, cheating and failing to share profits when required could result in serious disciplinary action, including bodily harm and death.

**Roles**

8. Defendant JOSEPH LIGAMBI, a/k/a "Uncle Joe," a/k/a "Unc," was a "made" member of the Enterprise who rose through its ranks to become its "underboss," then, after the incarceration of his predecessor Joseph Merlino, the "acting boss" of the Enterprise. Throughout the period of this indictment, defendant LIGAMBI directed the affairs of the Enterprise.

9. Joseph Massimino, a/k/a "Mousie," was a "made" member who served at times as the "underboss" of the Enterprise. In particular, Massimino was responsible for operating illegal gambling businesses, making extortionate extensions of credit and usurious loans, collecting extensions of credit using extortionate means and collecting other extortion payments on behalf of the Enterprise. In March 2004, Massimino was convicted of state criminal charges and subsequently incarcerated. Massimino continued to participate in the Enterprise's affairs even while incarcerated, both personally and through others, including defendant LIGAMBI, Staino, Lucibello, and Verrecchia.

10. Defendant GEORGE BORGESI, the nephew of defendant LIGAMBI, was a "made" member who served in various roles including, the "consigliere" of the Enterprise. Although he was incarcerated throughout much of the period of the superseding indictment, defendant BORGESI continued to conduct and participate in the affairs of the Enterprise from

his places of incarceration through others such as defendant LIGAMBI, Louis Monacello, Associate #1, and others, who engaged in and facilitated loansharking and gambling activities under the control of defendant BORGESI.

11. Martin Angelina, a/k/a "Marty," was a high-ranking "made" member of the Enterprise. Among other responsibilities, Angelina participated in operating an illegal gambling business and in attempting to collect extensions of credit using extortionate means.

12. Anthony Staino, Jr., a/k/a "Ant," was a "made member who rose to the rank of "caporegime" of the Enterprise and regularly assisted defendant LIGAMBI in controlling the Enterprise's affairs, including its gambling, extortion, and loansharking operations.

13. Joseph Licata, a/k/a "Scoops," was a "made" member who rose to the rank of "caporegime" of the North Jersey crew of the Philadelphia LCN Family and supervised Louis Fazzini, a/k/a "Big Lou," a "made" member of this crew, in the operation of an illegal sports gambling business, and other activities.

14. At times relevant to this indictment, other "made" members included Damion Canalichio, a/k/a "Dame," Gaeton Lucibello, "a/k/a The Big Guy," a/k/a "Gate," and Eric Esposito, as well as others known and unknown to the grand jury. Canalichio served the Enterprise in a variety of capacities, including assisting in the operations of the Enterprise's illegal sports bookmaking businesses and loansharking activities. Lucibello was a close associate of Massimino and assisted Massimino in operating the Enterprise's affairs from prison, including facilitating the collection of unlawful debts and proceeds of extortion on behalf of Massimino. In addition, Lucibello assisted in controlling the Enterprise's illegal gambling rackets and personally participated in two illegal gambling businesses. ESPOSITO assisted Canalichio and Angelina in operating an illegal gambling business.

15. During the period of this indictment, associates of the Enterprise included Louis Barretta, a/k/a "Sheep," Gary Battaglini, Robert Verrecchia, a/k/a "Boots," a/k/a "Bootsie," and Robert Ranieri, a/k/a "Bobby," as well as Louis Monacello and others known and unknown to the grand jury. Louis Monacello was a close associate of defendant BORGESI and assisted him in operating the Enterprise's affairs from prison, including some of its loansharking and illegal gambling operations. Barretta operated aspects of an illegal sports bookmaking operation and loansharking activities on behalf of the Enterprise. Battaglini assisted Barretta and Canalichio with their duties. Verrecchia assisted Massimino in operating illegal gambling businesses. Ranieri assisted Staino with loansharking and extortionate activities.

THE RACKETEERING CONSPIRACY

16. From in or about 1999, to in or about April 2012 ("the period of this superseding indictment"), in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LIGAMBI,**
**a/k/a "Uncle Joe,"**
**a/k/a "Unc," and**
**GEORGE BORGESI,**
**a/k/a "Georgie,"**

and Joseph Massimino,a/k/a "Mousie," Martin Angelina, a/k/a "Marty,"Anthony Staino, Jr., a/k/a "Ant," Gaeton Lucibello, a/k/a "The Big Guy," a/k/a "Gate," Damion Canalichio, a/k/a "Dame," Louis Barretta, a/k/a "Sheep," Gary Battaglini, Joseph Licata, a/k/a "Scoops," Louis Fazzini, a/k/a "Big Lou," Louis Monacello, Peter Caprio, and other persons known and unknown to the grand jury, being persons employed by and associated with the Philadelphia LCN Family, as described more fully in paragraphs 1-15 above, an enterprise which was engaged in, and the activities of which affected, interstate and foreign commerce, knowingly

combined, conspired, confederated, and agreed together and with other co-conspirators known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Philadelphia LCN Family, through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), as set forth in paragraphs 17-18 below, and through the collection of unlawful debts as defined in Title 18, United States Code, Section 1961(6), as set forth in paragraph 19 below.

PATTERN OF RACKETEERING ACTIVITY

17. The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), through which the defendants and their co-conspirators agreed to conduct and participate in the conduct of the affairs of the Enterprise, consisted of:

A. multiple acts indictable under federal law:

1. Title 18, United States Code, Section 892, Making Extortionate Extensions of Credit and Conspiring to do so;

2. Title 18, United States Code, Section 893, Financing Extortionate Extensions of Credit;

3. Title 18, United States Code, Section 894, Collections of Extortionate Extensions of Credit By Extortionate Means and Conspiring to do so;

4. Title 18, United States Code, Section 1512, Tampering with a Witness, Victim, or Informant;

5. Title 18, United States Code, Section 1951, Interference with Commerce by Threats and Violence - Extortion;

6. Title 18, United States Code, Section 1955, Conducting, Financing, Managing, Supervising, and Directing Illegal Gambling Businesses;

7. Title 18, United States Code, Section 1084, Transmission of Bets and Gambling Information;

8. Title 18, United States Code, Section 1952, Interstate Travel and Transportation in Aid of Racketeering;

9. Title 18, United States Code, Section 1956, Laundering of Monetary Instruments and Conspiracy;

B. multiple acts involving:

1. Extortion, chargeable under Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 3923, 901, 903 and New Jersey Statutes Annotated, 2C:20-5; 2C:5-1; 2C:5-2; 2C:2-6; and

2. Gambling, chargeable under Title 18, Pennsylvania Consolidated Statutes Annotated, Sections 5513, 5514, 901, 903 and New Jersey Statutes Annotated, 2C:37-2.

18. It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

COLLECTION OF UNLAWFUL DEBT

19. The collection of unlawful debt through which the defendants and their co-conspirators agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise consisted of the collection from various individuals of unlawful debts, as that term is defined by Title 18, United States Code, Section 1961(6), that is: (a) a debt which

was incurred and contracted in gambling activity and which was incurred in connection with the business of gambling, which activity and business were in violation of the laws of the United States and the Commonwealth of Pennsylvania; and (b) debts which were unenforceable under state and federal law in whole and in part as to principal and interest because of the laws relating to usury and which were incurred in connection with the business of lending money at a rate usurious under state and federal law, where the usurious rate was at least twice the lawfully enforceable rate.

MANNER AND MEANS OF THE CONSPIRACY

20. To further their goal of generating money for the Enterprise, the defendants, their co-conspirators, and associates, operated numerous illegal gambling businesses, made extortionate extensions of credit, used extortionate means to collect debts, loaned money at usurious rates, extorted property and things of value from business owners, and stole money from an employee health benefit plan. To cultivate, exploit, and extend the Enterprise's affairs and its reputation for violence, and thereby to achieve its purposes, the defendants and their co-conspirators used, and conspired to use, acts of violence, including assaults and attempted assaults. The defendants and their co-conspirators operated the conspiracy using the following manner and means, among others.

**Defendant LIGAMBI's Leadership Of The Enterprise**

21. After the incarceration of Joseph Merlino, the prior boss of the Philadelphia LCN Family, defendant LIGAMBI began to serve as the acting boss of the Enterprise and ran its affairs. In so doing, defendant LIGAMBI supervised and directed members and associates of the Philadelphia LCN Family, including all of the defendants named here, in the commission of various criminal acts as set forth in paragraphs 18-20 above, for the economic benefit of the

members of the Enterprise, to perpetuate the Enterprise's existence, and to conceal it from law enforcement detection.

22. As the Enterprise's boss, defendant LIGAMBI would mediate disputes among members and associates of the Philadelphia LCN Family, and act as the final authority in settling such disputes and in collecting and allocating the distribution of the Enterprise's criminal proceeds.

**Illegal Gambling Businesses**

23. Defendant LIGAMBI along with defendant BORGESI, Staino, Massimino, Angelina, Lucibello, Canalichio, Barretta, Battaglini, Esposito, Licata, Fazzini, and their associates Verrecchia and others, operated numerous illegal gambling businesses in the Eastern District of Pennsylvania and elsewhere for the benefit of the Enterprise. Those businesses include those described in Counts 43 through 49 of this superseding indictment, which are incorporated by reference and summarized below:

A. The JMA Video Poker Business: Defendant LIGAMBI, Massimino, and Staino, and other conspirators participated in running an illegal electronic gambling device business that involved five or more persons and operated continuously in the Philadelphia, Pennsylvania region in violation of the laws of the Commonwealth of Pennsylvania.

1. In operating this business, defendant LIGAMBI, Massimino, and Staino caused electronic gambling devices, including video poker machines and other gambling devices, to be placed in bars, restaurants, convenience stores, coffee shops and other locations in Philadelphia, Pennsylvania and its suburbs to be used for illegal gambling in violation of the laws of the Commonwealth of Pennsylvania.

2. Defendant LIGAMBI, Massimino, and Staino, operated and

managed their illegal video poker and gambling machine business by using facilities in interstate commerce, including the telephone, to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of their illegal gambling enterprise. Thereafter, defendant LIGAMBI, Massimino, and Staino performed additional acts to do the same in operating their illegal gambling enterprise. The [co-conspirators] also used coded phrases when discussing the Enterprise's illegal affairs over the telephone.

           3.     Staino regularly drove from his residence in New Jersey to Philadelphia, Pennsylvania to collect gambling proceeds from the bars, restaurants, convenience stores, coffee shops and other locations where the illegal video poker and gambling machines were located.

           4.     Defendant LIGAMBI, Massimino, and Staino, used the Philadelphia LCN Family's reputation for violence to advance and sustain their illegal gambling business. For example, after federal law enforcement agents seized 34 of their illegal electronic gambling devices in April 2001, defendant LIGAMBI, Massimino, and Staino sought to obtain replacement machines and "stops" from another source.  In or about May 2001, the [co-conspirators] extorted the owners of another illegal electronic gambling device business, that specialized in video poker machines, by forcing them to sell their illegal business, including 34 video poker machines which were located at over 20 "stops" in the Philadelphia region. To conceal this extortion, Massimino attempted to force the owners to sign a fictitious agreement of sale, and paid the owners a portion of the true value of the business, to create the false appearance that the extortion was a legitimate business transaction, when, it was not. To conceal the illicit nature of their business, the [co-conspirators] paid the owners over time in installments,

partially by checks written by Staino, and issued receipts that they required one of the owners to sign.

5. In or about July 2002, defendant LIGAMBI, Massimino, and Staino created JMA Industries to attempt to conceal the illegal nature of their operations and the criminal proceeds of the illegal gambling business from law enforcement. The acronym "JMA" was comprised of the first initials of the defendant's first names or nicknames: "Joe" (defendant LIGAMBI), "Mousie" (Massimino) and "Anthony" (Staino). JMA Industries purported to be a company which leased electronic gambling devices to other businesses. In fact, the [co-conspirators] used JMA Industries to obscure the criminal nature of their illegal electronic gambling device business by making their operation appear legitimate. [ ] JMA Industries issued payments to Staino and to defendant LIGAMBI's wife, the origin of which were the criminal proceeds the [co-conspirators] and their associates collected in connection with their illegal electronic gambling device business.

B. "Lou's Crab Bar": Massimino, his associate, Verrecchia, and their co-conspirators owned, operated, and facilitated the operation of an illegal gambling business involving illegal gambling devices, including video poker machines, and illegal sports bookmaking, that is, illegally accepting wagers on horse racing in violation of Pennsylvania law. This business was operated at a Philadelphia establishment then known as Lou's Crab Bar, located at 1100-02 West Moyamensing Avenue, Philadelphia, Pennsylvania, which was also a regular meeting place for members of the Enterprise. Massimino used third party nominees to conceal his ownership and control of the illegal gambling business operating at Lou's Crab Bar.

C. "Cholly Bears" and "DiNicks": Gaeton Lucibello and

his co-conspirators owned, supervised, operated and managed two illegal gambling businesses, namely, illegal electronic gambling device businesses involving the illegal use of video poker machines. These businesses were conducted at two Philadelphia sportsbars, Cholly Bears and DiNicks. Cholly Bears was located at located at 2535 South 13th Street, Philadelphia, Pennsylvania. DiNicks was located at 1528 Snyder Avenue, Philadelphia, Pennsylvania.

1. In addition to operating illegal gambling enterprises, Lucibello advanced the Enterprise by protecting its territory with respect to its illegal gambling device businesses. In particular, Lucibello was responsible for mediating disputes among rival associates of the Philadelphia LCN Family. For example, on one occasion, when an Enterprise associate tried to block the opening of an illegal electronic gambling device business by another associate, Lucibello attempted to resolve the dispute by trading on his status as a made member of Philadelphia LCN Family. Lucibello ordered one associate to tell the other associate to "come see me. He should button up after he hears that."

D. "First Ward Republican Club": Angelina, Canalichio, Esposito, their criminal partner known to the grand jury as Associate #2, and other co-conspirators, conducted, financed, managed, supervised, directed, and owned all or part of illegal gambling businesses, namely illegal electronic gambling device business involving the illegal use of video poker machines. These businesses were conducted at the First Ward Republican Club, a private club where Enterprise members met regularly, which was located at 2300 S. Woodstock Street, Philadelphia, Pennsylvania.

E. Sports Bookmaking: Canalichio, Staino, Barretta, Battaglini, Fazzini, and other co-conspirators directed and otherwise managed the day-to-day operation of illegal sports bookmaking businesses on behalf of defendant LIGAMBI, defendant BORGESI, Licata, and

other members of the Enterprise, known and unknown to the grand jury. As part of the illegal sports bookmaking activity, the [co-conspirators] extended credit and collected gambling and usurious debts. Defendant LIGAMBI, Staino, Barretta, and Battaglini regularly collected debts, and caused the collection of debts, owed for sports bets to the Enterprise's illegal gambling businesses. After making these collections, Staino would meet with defendant LIGAMBI at LIGAMBI's residence to deliver proceeds. While incarcerated, defendant BORGESI received proceeds from the sports bookmaking operation that was operated and managed by Louis Monacello on BORGESI's behalf. As alleged in more detail below, the [co-conspirators] relied upon the Philadelphia LCN Family's reputation for violence to enforce their illegal debts and in making these collections.

**Loansharking Activities**

24. Defendant LIGAMBI, Staino, Massimino, defendant BORGESI, Canalichio, Angelina, Barretta, and Battaglini, and their co-conspirators, approved, supervised, and otherwise participated in extortionate extensions of credit, collections of debts using extortionate means, and other illegal demands, to generate income for the Enterprise and its members.

25. LIGAMBI, Staino, Massimino, BORGESI, Canalichio, Barretta and Battaglini, and their co-conspirators also extended loans charging usurious rates of interest as part of the illegal terms of the loan, and used extortionate means to collect payments related to these loans.

26. In connection with making and collecting extensions of credit and usurious loans, LIGAMBI, Staino, Massimino, BORGESI, Canalichio, Barretta, and Battaglini cultivated and exploited the violent reputation of the Enterprise to discourage resistance to their extortionate demands and to threaten borrowers that if they did not promptly repay the loans, with interest, they would suffer physical and economic harm. The [co-conspirators] also used express and

implied threats of physical violence and economic harm to instill fear in their victims and to preserve and sustain the Enterprise as exemplified below:

        A.    In or about April 2002, Canalichio and Barretta threatened Victim A in connection with making an extortionate collection of a usurious loan debt when they told Victim A that they were attempting to collect "Uncle Joe's money" (referring to defendant LIGAMBI, the Enterprise boss), from Victim A.  In a subsequent conversation, Barretta told Victim A that Canalichio was "capable of cracking" Victim A if necessary to collect that debt.  On other occasions, in or about April and May 2002, Battaglini and Canalichio described to Victim A how they had repeatedly assaulted another debtor, including an instance where Canalichio caught the debtor by surprise and beat him with a bat.

        B.    Barretta and Battaglini repeatedly threatened Victim B in connection with loansharking activities, using extortionate means, to collect and attempt to collect extensions of credit which arose from unpaid gambling debts.  For example, in or about January 2002, Battaglini threatened Victim B by stating that if Victim B did not make his payment, Victim B would "see a side of me you ain't gonna fucking enjoy ....   Cause right now I wanna fuckin' put a bullet in your head."   On another occasion, in or about March 2002, Barretta explained to Victim B that it was important for Barretta to deal with gambling debtors who could pay him regularly because Barretta had to answer to the leadership of the Enterprise, stating: "[t]hey want their money Fridays, you know what I'm trying to say."  Barretta also explained that the Enterprise was facing financial hardship because the defendants and their co-conspirators were  financing the legal defenses for incarcerated Enterprise members as well as supporting their families.

        C.    Staino threatened Victim C in connection with extortionate collections of usurious loans.  For example, on one occasion, when Victim C was having difficulty making

payments, Staino threatened Victim C by stating that Staino ought to put a bullet in Victim C's head. On another occasion, in June 2003, Victim C told Staino that Victim C had lent money -- which Staino had lent to Victim C -- to another debtor, who was having difficulty repaying it. Staino then responded to Victim C: "you know this motherfucker, I'm going to kill him. Ok? I'm telling you right now I'm gonna kill him. Ok? And I don't talk like that." Staino directed Victim C that he needed to "talk to this kid," explaining: "You tell this motherfucker, but not on the phone ... He made his money. Everybody's making money and I can't get mine ... Now you can't get out of the situation ... You got all this fuckin' money out with this guy that nobody even fuckin' knows, and I'm gonna have to go fuckin' ... hurt this guy for something, for fuckin' something that I didn't even do ... I got fucking two gorillas ... fucking chop him up ... call him again, tell him I sat here with ya, tell him I'm agitated. That's all you got to say, he's very agitated, and ... you talked to him, and say 'okay, fine, next week is fine,' but ... without saying too much over the phone, but, ah, it ain't no little problem now. It's a big problem, because ... maybe he didn't know or whatever but now he knows so it's a different ball game ... I'll deal with him." During a different part of this conversation, in referring to the delinquent debtor, Staino told Victim C : "[h]e's using my fucking money ... There's 48 fuckin' thousand out there, plus nothin's comin' in. He's fuckin' flipping, you understand," referring to defendant LIGAMBI. Later, during this conversation, Staino told Victim C: "Explain to this guy that this ain't a joke so ... it's getting to a dangerous point." On a different occasion in July 2003, when Victim C was late with a payment, Staino told Victim C that if Victim C's failure to pay Staino was raised with Enterprise Boss defendant LIGAMBI "there would be some major, major problems."

           D.     Massimino made extensions of credit to Victim D and

attempted to collect those debts using extortionate means. On one occasion in 2005, while Massimino was incarcerated, Massimino sent a message to Victim D to repay Victim D's debt immediately. Massimino threatened that Victim D wouldn't "be able to hide anywhere in the U.S." from Massimino.

E. In August 2004, Staino, and his associate, Ranieri, attempted to threaten an individual known to the grand jury as "Dino," in connection with their making an extortionate extension of credit and collecting it using extortionate means. At the time, and unbeknownst to [Staino and Rainieri], "Dino" was a law enforcement officer acting in an undercover capacity. Staino and Ranieri warned "Dino" not to "fuck with" Staino in connection with repaying the debt. Staino reiterated the importance of "Dino's" making prompt payments by threatening: "Please on my life. I like you. I don't want to fucking have to hurt you." It was further part of the conspiracy that Staino and Ranieri attempted to conceal their illegal activities and to prevent the detection by law enforcement of the conspiracy by directing "Dino" to produce a fraudulent IRS Form 1099 ("1099 Form") in connection with part of his repayment, so that Staino could disguise the repayment of the extortionate loan by creating the false appearance that the payment was legitimate income.

**Loansharking and Associate #1**

27. From approximately Spring 2005 until 2008, defendant BORGESI and Louis Monacello provided money to an individual known to the grand jury and identified here as Associate #1 for Associate #1 to make extortionate extensions of credit to others. Associate #1 provided a portion of the illegal proceeds collected from these extortionate extensions of credit to Monacello. Associate #1 also assisted Monacello in making extortionate demands from others, including Victims E and F.

28. LIGAMBI, Staino, BORGESI, and Angelina, along with Louis Monacello, extended usurious loans and extortionate extensions of credit to and/or engaged in debt collections using extortionate means from Associate #1 by using the Enterprise's reputation for violence.

**Extortion Activities**

29. LIGAMBI, Staino, Massimino, Lucibello, BORGESI, and their co-conspirators, approved, supervised, and otherwise participated in extortion activities to generate income for the Enterprise and its members. For example, from 2000 to 2007, defendant LIGAMBI selected various bookmakers who were conducting criminal activity in Philadelphia and southern New Jersey, and ordered Louis Monacello to extort these bookmakers by demanding and collecting from them yearly "street tax," "tribute payments," or "Christmas payments" to avoid personal harm and the disruption of their illegal bookmaking businesses.

30. From approximately 2002 to 2006, Massimino, with the assistance of Lucibello, extorted Bookmaker A by demanding that Bookmaker A provide yearly tribute payments to the Philadelphia LCN Family, through Massimino and Lucibello, to avoid personal harm and the disruption of Bookmaker A's illegal bookmaking business.

31. Defendant LIGAMBI, Massimino, and Staino extorted and caused the extortion of business owners in the Philadelphia area, by obtaining property of the victims through express and implied threats and intimidation. For example, in May 2001, defendant LIGAMBI, Massimino, and Staino extorted the owners of an illegal electronic gambling device business, specializing in video poker machines, and forced them to sell that business as described in paragraph 23.A.4. To conceal the criminal nature of their demands, the [co-conspirators]

created false and fictitious sales agreements which they attempted to force the victims to sign to make it appear as if their extortion was a legitimate business transaction, when it was not.

**Obstruction & Concealment Activities**

32. The defendants and their co-conspirators attempted to conceal their criminal activities, including, but not limited to, those actions specifically described above. For example, the defendants and their co-conspirators regularly communicated in coded language over the telephone, participated in "walk and talks," that is, covert conversations while walking to and standing at locations where the defendants believed they could not be intercepted. The defendants also communicated with potential and prospective witnesses in an attempt to corruptly persuade them to withhold testimony, records, documents, and other objects from an official proceeding. The defendants also created and caused the creation of false and fictitious documents designed to hide the illegal nature of their activities, and established companies that had the appearance of legitimacy, but in fact, were created to launder money and to conceal the illegal nature of their operations.

All in violation of Title 18, United States Code, Sections 1962(d).

## COUNT TWO

**Conspiracy To Conduct an Illegal Gambling Business - The JMA Video Poker Business**

1. From in or about 2000 to in or about December 2010, in the Eastern District of Pennsylvania and elsewhere, defendant

**JOSEPH LIGAMBI,**
**a/k/a "Uncle Joe,"**
**a/k/a "Unc,"**

and Joseph Massimino, and Anthony Staino, Jr., knowingly conspired and agreed together and with other co-conspirators known and unknown to the grand jury, to violate Title 18, United States Code, Section 1955, by conducting, financing, managing, supervising, directing, and owning all or part of an illegal gambling business, that is: an illegal electronic gambling device business involved in the operation of electronic gambling devices, which constituted a violation of the laws of the Commonwealth of Pennsylvania (Title 18, Pennsylvania Consolidated Statutes Annotated, Section 5513), and which involved five or more persons who conducted, financed, managed, supervised, directed, and owned all or part of such business and which had been in substantially continuous operation for a period in excess of thirty days and had a gross revenue of $2,000 in any single day in violation of Title 18, United States Code, Section 1955.

MANNER AND MEANS OF THE CONSPIRACY

The manner and means of the conspiracy included the following:

2. Defendant LIGAMBI, Massimino, and Staino, operated, and directed the operation of, an illegal electronic device gambling business in the Philadelphia, Pennsylvania region.

3. Defendant LIGAMBI, Massimino, and Staino caused numerous

electronic gambling devices, including video poker machines and other gambling machines, to be placed in bars, restaurants, convenience stores, coffee shops and other locations in Philadelphia, Pennsylvania and its suburbs to be used for illegal gambling in violation of the laws of the Commonwealth of Pennsylvania.

4. Defendant LIGAMBI, Massimino, and Staino operated and managed their illegal electronic gambling device business by using facilities in interstate commerce, including the telephone, to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of their illegal gambling business. Thereafter, defendant LIGAMBI, Massimino, and Staino performed additional acts to do the same in operating their illegal gambling business. The co-conspirators would use coded conversations when discussing their illegal affairs using the telephone.

5. Staino regularly drove from his residence in New Jersey to Philadelphia, Pennsylvania to collect criminal proceeds from the network of bars, restaurants, convenience stores, coffee shops and other locations that housed the defendants' illegal electronic gambling devices.

6. After federal law enforcement officers seized 34 of their illegal electronic gambling devices in April 2001, the co-conspirators devised a plan to attempt to conceal the illegal nature of their operations from law enforcement detection.

7. In or about July 2002, defendant LIGAMBI, Massimino, and Staino, created JMA Industries. The acronym "JMA" was comprised of the first initials of their first names or nicknames: "Joe" (defendant LIGAMBI) "Mousie" (Massimino) and "Anthony" (Staino). JMA Industries purported to be a company which leased electronic gambling devices to other businesses. In fact, the co-conspirators attempted to use JMA Industries to obscure the

criminal nature of their illegal electronic gambling device business by making their operation appear legitimate[.] For example, JMA Industries issued W-2 forms to Staino and the wife of defendant LIGAMBI. In addition, JMA Industries issued payments to Staino and to defendant LIGAMBI's wife, the origin of which were the criminal proceeds the defendants collected in connection with their illegal electronic gambling device business.

OVERT ACTS

8. In furtherance of the conspiracy, and to achieve its objects, the [co-conspirators] committed, and caused to be committed, in the Eastern District of Pennsylvania and elsewhere, the following overt acts, among others:

A. On numerous dates throughout the period of this superseding indictment, defendant LIGAMBI, Massimino, and Staino, and their co-conspirators placed and caused the placement of, illegal electronic gambling devices, including video poker and other gambling machines, in numerous bars, restaurants, convenience stores, coffee shops and other locations in the Philadelphia region.

B. On numerous dates throughout the period of this superseding indictment, defendant LIGAMBI, Massimino, and Staino, and their co-conspirators maintained and cause the maintenance of, the illegal electronic gambling devices described above.

C. On numerous dates throughout the period of this superseding indictment, defendant LIGAMBI, Massimino, and Staino, and their co-conspirators collected and caused the collection of, criminal proceeds generated as a result of the operation of their illegal gambling business.

D.    On or about February 3, 2001, at 10:33 a.m., Staino engaged in a conversation related to operating the illegal gambling business and discussed the need to fix one of the business's broken electronic gambling devices.

E.    On or about February 6, 2001, at 11:10 a.m., Staino engaged in a conversation related to operating the illegal gambling business and discussed the need to replace a broken bill acceptor on an illegal electronic gambling device at one location with the bill acceptor from another location.

F.    On or about February 13, 2001, Staino engaged in several conversations related to operating the illegal gambling business.

G.    On or about February 22, 2001, Staino engaged in several conversations related to operating the illegal gambling business and directed a criminal partner, known to the grand jury and identified here as Associate #2, to repair a broken bill acceptor on an illegal electronic gambling device.

H.    On or about February 27, 2001, Staino engaged in several conversations with a criminal associate, known to the grand jury and identified here as Associate #2, related to operating the illegal gambling business, including discussing directions that Massimino provided to the criminal partner to carry out the illegal gambling business' affairs.

I.    On or about March 7, 2001, at 5:23 p.m., Staino received a call from a criminal associate, known to the grand jury and identified here as PD who, while speaking in coded language, indicated that law enforcement officers had confiscated the illegal electronic gambling device located in his coffee shop.  The criminal associate attempted to disguise the true nature of the illegal gambling device by describing the confiscated illegal electronic gambling device as a "coffee machine."

J.      On or about March 12, 2001, after Staino had caused the replacement of the illegal electronic gambling device which law enforcement officers seized from PD as described above, Staino engaged in a conversation with PD who had called to inform him, in coded language, that the bill acceptor on the replacement electronic gambling device was not working.  PD noted that "ah, expresso machine, no work too good" to which Staino replied, "What, is it broke?" to which PD responded "No, every time I put the coffee on, it send it right back to me."  On or about March 13, 2001, Staino directed his criminal partner, known to the federal grand jury and identified here as Associate #2, to repair the replacement illegal electronic gambling device deceptively referenced by PD as an "espresso machine."

K.      On or about April 5, 2001, Staino engaged in several conversations with criminal associates known to the grand jury and identified here as PD and Associate #2, related to operating the illegal gambling business, including coded conversations in which Staino directed Associate #2 to repair PD's "coffee machine," an electronic gambling device.  When Associate #2 expressed confusion as to what Staino meant by "coffee machine," Staino clarified by stating: "Well, you know the thing, he says coffee machine."

L.      On or about April 5, 2001, at 7:13 p.m., defendant LIGAMBI, and Staino engaged in a conversation where they discussed the payment arrangements they had with their criminal partner, known to the grand jury and identified here as Associate #2, in that Associate #2 worked for the illegal gambling business without charge.

M.      On or about April 5, 2001, immediately following the conversation described in overt act L, Staino engaged in a conversation with defendant Massimino about the whereabouts of their criminal partner, known to the grand jury and identified here as Associate #2.  Defendant LIGAMBI then joined the conversation and complained to Massimino that their

illegal gambling business stood to lose money because Associate #2 was not attending to one of the co-conspirators' illegal electronic gambling devices fast enough at one of the illegal gambling business' "better" places. Specifically, defendant LIGAMBI noted, in the coded conversation, "Anthony (meaning Staino) will tell you but, that's one, fucking one of the best things, because last month, we, we blew it because, you know what I'm talking about." Massimino replied, "Yeah, all right, let Anthony come around and tell me," and then defendant LIGAMBI, directed Staino to do just that.

N.     On or about April 9, 2001, at 5:14 p.m., after law enforcement agents from the Federal Bureau of Investigation executed a court-authorized search warrant at the premises of PD and seized an electronic gambling device, Staino received a telephone call from a criminal associate known to the federal grand jury and identified here as PD, who informed Staino, in a coded conversation: "Ant, listen to me buddy, listen to me please. They took my coffee machine. They took them." Staino then inquired: "They took them, they took them again?" PD responded: "The FBI this time." Staino responded using coded language, stating: "Okay, all right, I'll talk to you. Oh yeah, they took the coffee, okay."

O.     On or about May 2001, after the FBI seized approximately 34 of their illegal electronic gambling devices from numerous different locations, defendant LIGAMBI, Massimino, and Staino approached the operators of another illegal electronic gambling device business and forced those operators to relinquish their illegal business for a fee that undervalued their business. Defendant LIGAMBI, Massimino and Staino then incorporated the assets of that business into their existing illegal electronic gambling device business.

P.     In or about July 2002, defendant LIGAMBI, Massimino, and Staino, created a company, called JMA, Industries which was named after the three defendants.

Q.     On or about September 2, 2003, Massimino engaged in a discussion to promote the defendants' illegal electronic gambling device business.

R.     On or about December 12, 2003, Massimino engaged in a conversation with a criminal associate, known to the grand jury and identified here as Associate #2, regarding the [] illegal electronic gambling device business.

S.     On or about June 17, 2004, Massimino and his criminal partner, known to the grand jury and identified here as Associate #2, discussed matters related to the illegal gambling device businesses, including the need to attend to an illegal gambling device.

T.     At various times, throughout the period of this superseding indictment, including Fall 2005 through the date of this superseding indictment, Associate #2 would service, repair and otherwise maintain the illegal electronic gambling devices by traveling to locations throughout Philadelphia, Pennsylvania and its suburbs.  For example, on or about May 18, 2010, Staino contacted Associate #2 about a broken electronic gambling device to seek his assistance.

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE

**Illegal Electronic Gambling Device Business - The JMA Video Poker Business**

**THE GRAND JURY FURTHER CHARGES THAT:**

1. From in or about 2000 to in or about December 2010, in the Eastern District of Pennsylvania and elsewhere, defendants

**JOSEPH LIGAMBI,**
**a/k/a "Uncle Joe,"**
**a/k/a "Unc,"**

and Joseph Massimino, Anthony Staino, Jr., and others known and unknown to the grand jury, knowingly conducted, financed, managed, supervised, directed and owned all or part of an illegal gambling business as that term is defined in Title 18, United States Code, Section 1955(b), and aided and abetted the conducting, financing, managing, supervising, directing and owning of an illegal gambling business, that is, an electronic gambling device business operated in violation of the laws of the Commonwealth of Pennsylvania (Title 18, Pennsylvania Consolidated Statutes Annotated, Section 5513), in which the illegal gambling business was conducted, and which involved five or more persons who conducted, financed, managed, supervised, directed and owned all or part of said business and which business remained in substantially continuous operation for a period in excess of thirty days and which business had a gross revenue in excess of $2,000 in a single day.

In violation of Title 18, United States Code, Sections 1955 and 2.

**COUNT FOUR**

**Obstruction of Justice**

**THE GRAND JURY FURTHER CHARGES:**

On or about October 12, 2010, in the Eastern District of Pennsylvania, defendant

**JOSEPH LIGAMBI,**
**a/k/a"Uncle Joe,"**
**a/k/a "Unc,**

knowingly intimidated, threatened, and corruptly persuaded, and attempted to intimidate, threaten and corruptly persuade, an individual known to the grand jury and identified here as Individual G, by placing his hand on Individual G and making threatening statements to Individual G with the intent to cause and induce Individual G to withhold a photograph from an official proceeding, namely a federal grand jury proceeding.

In violation of Title 18, United States Code, Section 1512(b)(2)(A).

**A TRUE BILL:**

**GRAND JURY FOREPERSON**

**ZANE DAVID MEMEGER**
United States Attorney
Eastern District of Pennsylvania